191 So. 237

STATE v. BLAIR.

3 Div. 298.

Supreme Court of Alabama.

June 15, 1939.

Rehearing Denied Oct. 12, 1939.

Thos. S. Lawson, Atty. Gen., and Wm. H. Loeb and John W. Lapsley, Asst. Attys. Gen., for the State.

Ball & Ball, of Montgomery, for appellee.

**GARDNER, Justice.**

By virtue of the provisions of the General Acts 1923, page 36, General Acts 1927, pages 16 and 326, General Acts 1931, page 859, General Acts 1932, Ex.Sess., page 314, all as amended, there is levied what is known as an excise tax (City of Birmingham v. State, 233 Ala. 138, 170 So. 64), aggregating six cents per gallon on the storage or withdrawal from storage of gasoline in Alabama, and reports are required as to the amounts so stored or withdrawn.

The State insists that defendant Blair stored and withdrew from storage a large gallonage of gasoline without making the report and without payment of the excise tax, and instituted this suit for the recovery thereof. The trial was upon an agreed statement of facts resulting in a judgment in favor of defendant, from which the State prosecutes this appeal.

The territory known as "Maxwell Field" in the city of Montgomery is a military reservation of the United States Government, which was, for such purpose, acquired in the year 1920 by purchase by the United States.

The first gasoline tax statute, which forms the basis of this suit, was enacted in 1923.

In 1932 defendant entered into a written contract with the United States Government for the grading of the landing field of this military reservation. And in November, 1932, and January, 1933, Blair received on this reservation the gasoline on which this tax is claimed, the shipment being made from the state of Texas direct to "Maxwell Field." That the gasoline thus shipped to Blair moved in interstate commerce from Texas to this reservation is clear enough and not controverted, nor is it insisted that it was subject to the tax while en route from Texas to its destination at the reservation.

The State contends, however, that the storage and withdrawal from storage of the gasoline by Blair rendered him subject to the tax, notwithstanding the fact that it remained all the while on this reservation, where it was withdrawn and used in furtherance of the work undertaken by the contract.

But we think otherwise. The Constitution of the United States in Article 1, section 8, clause 17, U.S.C.A., makes provision for the exercise by Congress of exclusive legislation over all places purchased by consent of the legislature of the state in which the same shall be, "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." "Exclusive legislation" is consistent only with exclusive jurisdiction. James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318.

The mere ownership and use of the lands by the United States do not withdraw them from the jurisdiction of the state. But the above noted constitutional provision becomes applicable when the United States acquires the land with the consent of the state for the purpose there described. James v. Dravo Contracting Co., supra.

Here, it appears the United States purchased the land for the purpose set forth in the Federal Constitution. Was it thus acquired with the consent of the State? At the time of the purchase sections 898 and 899, Code of 1907, were in full force and effect. They were but codifications of the Act of 1903 (General Acts 1903, page 43). By these statutes the State ceded to the United States jurisdiction "over all lands which have been or may hereafter be purchased" for the purposes enumerated above, and expressly provided that jurisdiction should be exclusive for all purposes except for the service of process issued out of the courts of the State. This exception was the sole qualification annexed to the cession, and by the terms of this statute jurisdiction was ceded unreservedly to the federal government. And, in the absence of any contrary intent, acceptance of this exclusive jurisdiction, is, under all the authorities, to be presumed. Pound v. Gaulding, Ala.Sup., 187 So. 468.[1] The lands here involved were purchased by the United States after the passage of the Act of 1903, and while these sections constituted a part of the Code of 1907, now sections 1505, 1506, Code of 1923.

---

[1] 237 Ala. 387.

■ The argument of the State that these Code provisions are referable only to past transactions is refuted by the very language of the statute, and ignores and treats as surplusage the words "or may hereafter be purchased." But these words are not to be ignored. They should be given their proper meaning and accorded the result they so plainly indicate. So interpreted, the statute coincides with much precision with the facts of this case, and discloses exclusive jurisdiction over this territory in the United States Government.

So considered, the cases of Standard Oil Co. v. California, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775, and Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L. Ed. 1091, are here in point, and fully support the theory of non-liability of defendant for this tax. The holding of the court in each case is well and succinctly stated in the headnote. In Standard Oil Co. v. California, supra, the ruling is stated in the following manner: "A State is without power to levy a license tax in respect of the selling and delivery of goods on a military reservation included within the exterior limits of the State but over which the full legislative authority has been ceded to the United States by an Act of the State Legislature."

And that of Surplus Trading Co. v. Cook, supra, reads: "Under Art. I, § 8, cl. 17, of the Constitution, land purchased by the United States for an Army station, with the consent of the legislature of the State in which it lies, comes under the exclusive jurisdiction of the United States, and private personal property there situate can not be taxed by the State."

Thus far, therefore, the case for the defendant is clear enough. But, as we understand the argument, the State contends the law, as above stated, has been modified, if not in fact overturned, by the decisions in the more recent cases of James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318, Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187, and Atkinson v. Tax Commission of Oregon, 303 U.S. 20, 58 S.Ct. 419, 82 L.Ed. 621.

■ But, as said by the Supreme Court of the United States in Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 57 S.Ct. 356, 358, 81 L.Ed. 532 (noted by this Court in State ex rel. Wilkinson v. Murphy, Ala.Sup., 186 So. 487),[2] "it is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." And when the cases are reviewed in the light of the facts and of the questions presented for determination, we think it clear they contain no indication of any reflection upon the integrity of the decision in Surplus Trading Co. v. Cook, and Standard Oil Co. v. California, supra, or the soundness of the principle of law therein announced. Illustrative is the opinion in Dravo case, supra, wherein as to the beds of rivers involved, it was pointed out that the title thereto was in the state, and as to other lands the cession by the state was of "concurrent jurisdiction," in section 3 of the act and in section 4 a reservation of the right to execute process "and such other jurisdiction and authority over the same as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition." Code W.Va. 1931, 1-1-3, 1-1-4.

Reservations as to process, it is observed, were found to be frequent in grants made by the states to the United States in order to avoid the granted places being made a sanctuary for fugitives from justice.

The reservation for process is the only qualification found in our Act of 1903, and is, as stated in the Dravo case, supra [302 U.S. 134, 58 S.Ct. 215], in no manner "incompatible with a cession of exclusive jurisdiction to the United States."

The real contention in the Dravo case, supra, however, related to the claimed inoperative effect of a reservation by the state in ceding jurisdiction to the federal government.

There were general expressions in some of the decided cases (United States v. Cornell, Fed. Cas. No. 14,867, 2 Mason 60, 65, 66, Fort Leavenworth R. Co. v. Lowe, 114 U.S. 527, 5 S.Ct. 995, 29 L.Ed. 264, and others) to the effect that in ceding by the state jurisdiction to the United States over land acquired by purchase, the state was without power to make reservation beyond that for service of process, by reason of provisions of Article 1, section 8, clause 17 of the Federal Constitution. These expressions, designated obiter dicta, were disapproved, and the holding was that the state "may qualify its cession by reservations not inconsistent with the government-

---

[2] 237 Ala. 332.

al uses." This is now the acknowledged rule.

And the question here presented is whether or not there were reservations in the cession by the State.

The cases of Surplus Trading Co. v. Cook, and Standard Oil Co. v. California, supra, did not involve any matter of reservation, and no expression therefore in these authorities called for any qualification. They were unaffected by the decision in the Dravo case, supra, but, on the contrary, we think their soundness was fully recognized in the opinion. The Surplus Trading Co. case, supra, dealt with property situated in a government reservation, and was of consequence more nearly in point as to some of the general statements of law, and we find it more than once approvingly cited.

Speaking of the acquisition of exclusive jurisdiction by the federal government, the court in the Dravo case, supra, observes: "Wherever the United States has such jurisdiction the state would have no authority to lay the tax," and the case of Surplus Trading Co. v. Cook, supra, is cited. The opinion also approvingly cites Arlington Hotel Co. v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447, United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761, which were noted and given application in Standard Oil Co. v. California, supra.

A careful reading of the other two cases (Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187, and Atkinson v. State Tax Commission, 303 U.S. 20, 58 S.Ct. 419, 82 L.Ed. 621), demonstrates likewise they in no manner reflect upon the soundness of the Standard Oil Co. or Surplus Trading Co. cases, supra, or affect the case here presented. A review of each of these cases and the differentiating facts would extend the opinion to undue length, as well as serve no useful purpose.

These cases also hold that though acceptance of exclusive jurisdiction may be presumed, yet "there appeared to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases." [302 U.S. 186, 58 S.Ct. 244.] And the holding was in the Mason case, supra, that there was no intent on the part of the federal government to accept exclusive jurisdiction, and no intent on the part of the state government to grant it, as disclosed not only by the action of administrative officials, "but by the deliberate and ratifying action of Congress, which gives the force of law to the prior official action even if unauthorized when taken."

■ The State lays some stress upon this holding as having a bearing here for the reason that the contract entered into by defendant Blair, in 1932, for the work to be done at Maxwell Field contained the following clause: "Article 10. Permits and care of work.—The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance."

This was a general clause in the contract, which was a "standard Government form of contract," required to be used generally on all public works in this country. It is to be interpreted only as one of the many precautionary measures deemed advisable by the Government and for its more complete protection.

The cases hereinabove noted disclose that in many instances over the country, state jurisdiction was retained and in these cases a clause of this general character would be applicable.

■ But here the federal government had acquired exclusive jurisdiction of this territory many years previous to this contract, and by no process of reasoning may it be said that such a clause is to be ascribed any significance upon the question of jurisdiction here involved. And like reasoning would lead to like result as to the request, in 1927, to the governor by "H. H. Richards, Major Air Corps, Commanding," for a deed of cession from the State under section 3 of the Act of January 28, 1848,—General Acts 1847–50, page 92. There is nothing in this record to indicate the officer making the request had authority to waive any of the rights of the federal government or in any manner impair or affect any title or jurisdiction it had acquired. But so far as concerned any action of his, it is to be viewed in connection with the question of intent, as the letter discloses, by reference to section 3

of the Act of 1848, that a deed of exclusive jurisdiction was expected, and that was in fact the character of deed executed in conformity to that request. The authority of this officer is determined by law, and his authority is not to be enlarged merely by the exercise of a presumed power. Wadsworth v. State, 225 Ala. 118, 142 So. 529.

From our view of the case no deed of cession was necessary, and for what purpose it was requested, is purely a matter of speculation.

The federal government had acquired the land by purchase, for the purpose and in the manner contemplated in the federal Constitution, and the State had in general language by the statute (sections 1505, 1506, Code of 1923) ceded exclusive jurisdiction. This sufficed for all purpose, as held by this Court in Pound v. Gaulding, 237 Ala. 387, 187 So. 468, and Webb v. J. G. White Engineering Co., 204 Ala. 429, 85 So. 729.

But the State insists these cases failed to take into account what are now sections 3147–3161, Code of 1923, and that though the conclusion reached is correct in each case, yet the reasoning upon which it is rested is unsound.

As to Pound v. Gaulding, supra, we are directed to an Act of September 7, 1935 (General Acts 1935, page 777), as a basis for the decision rather than the cited statutes. True, our attention was not called to this Act by any of the parties in consideration of the Pound case, supra. But we see no necessity therefor in view of the cited statute, which was considered directly in point. It may properly be interpreted as merely a precautionary act with a purpose to give emphasis by name to that particular reservation. Nevertheless it was but an expression of the existing law, many instances of which may be found in our statutes.

The State contends further that sections 1505 and 1506, Code of 1923, should be considered in pari materia with sections 3147–3161, Code of 1923, and, so considered, they show a qualified consent of the State in territory acquired by the federal government to the extent of a reservation of State jurisdiction therein.

As originally enacted, and as carried into the Code of 1907 as sections 898 and 899, the Act of 1903 purported to embrace only those instances wherein the United States acquired land for governmental purposes

by purchase. When brought forward into the Code of 1923, the words "or otherwise acquired" were added (section 1505), but, as stated originally and as codified in the Code of 1907, the Act only applied to lands purchased. And, as previously observed, the original Act of 1848 provided for exclusive jurisdiction and contained an elaborate method of acquiring lands by the Government by way of condemnation, and makes provision for a deed by the governor. No deed was required by the Act of 1903, nor the Code section of which it is the progenitor. The Act of 1848 was brought forward into the Code of 1852 (sections 21–23, Art. III), and contained the same provisions for condemnation and the execution of a deed by the governor, but added after the words concerning reservation of jurisdiction for the service of process, the following: "nor prevent the laws of this State from operating over such lands."

It is this language the State contends reserved to the State full concurrent jurisdiction with that of the federal government. In practically the same form the sections containing these words have been brought forward into subsequent Codes. Sections 22–24, Code of 1867; sections 19–22, Code of 1876; sections 19–22, Code of 1886; sections 626–629, Code of 1896; sections 2413–2427, Code of 1907, and sections 3147–3161, Code of 1923.

And sections 18 and 19, Code of 1852, have likewise been brought forward into subsequent codes, containing the statement that "the extent of * * * jurisdiction over places that have been or may be ceded to the United States is qualified by the terms of such cession." See section 2993, Code of 1923.

When the lands were to be acquired by condemnation proceedings the deed was executed under court supervision, and in the same chapter is provision for a deed by the governor in event of a purchase. As observed, the original Act of 1903, and as codified into the Code of 1907, involved acquisition by purchase only, and in later codes the words "or otherwise acquired" were added.

Confessedly if the language of the Act relating to a deed from the governor is to be given the meaning contended for by the State there is confusion and difficulty in reconciliation.

Considering these statutes independently, and following the State's construction of sections 3147–3161, Code of 1923, the federal government, upon purchasing property for constitutional purposes, would by virtue of sections 1505, 1506, Code of 1923, obtain exclusive jurisdiction, but if application is made for a deed from the Governor the jurisdiction of the State is fully reserved, and the State may proceed to pass laws affecting such territory as if there had been no cession of jurisdiction whatever, saving only security to the property and its exemption from taxation.

▮▮▮ We do not conceive that such a result was intended by the lawmakers or that the language used leads to that end. It was recognized as a general rule of public law that whenever political jurisdiction and legislative power over any territory are transferred from one sovereign to another, the existing municipal laws (as defined in Vilas v. Manila, 220 U.S. 345, 31 S.Ct. 416, 55 L.Ed. 491, and Chicago, Rock Island & P. Ry. v. McGlinn, 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270) continue in force until abrogated or changed by the new sovereign, and it was this principle that was given recognition in our recent case of Pound v. Gaulding, supra.

We think it was in this sense that the language "nor prevent the laws of this State from operating over such lands" was used, and that it was not the legislative intent to reserve to the State full jurisdiction in the ceded territory. If such had been the intent we think different language, more clear and distinct to that effect, would have been used. Surplus Trading Co. v. Cook, supra.

▮▮▮ If it may be said this would but be placing an existing rule of law into statutory form, many instances of like character are to be found in our present Code. The Act of 1903 appears to be full and complete within itself, and bears no indication whatever of having any reference to any other statute, or any necessity that it should be considered in connection with any other statute. The interpretation we have given sections 3147-3161, Code of 1923, harmonizes these provisions in so far as the results are concerned. But reduced to its last analysis, there is no absolute necessity that these separate and different provisions be now reconciled. The Act of 1903 was the last legislative expression on the subject, and if a conflict exists it is to control. Alabama Power

Co. v. City of Scottsboro, ante, p. 230, 190 So. 412.

By virtue of that statute exclusive jurisdiction vested in the United States when it purchased the property in 1920, and we are clear to the view that whatever may have prompted the officer at Maxwell Field to request a deed in 1927, his request and the deed executed in compliance therewith did not serve to divest the United States of such jurisdiction which it had presumably accepted and exercised during all of those years. And we think it clear enough also that the request itself shows no such intention, but that the officer expected a deed giving exclusive jurisdiction.

The conclusion is therefore that exclusive jurisdiction is vested in the United States over this territory, and that the gasoline tax which was passed some three years after the acquisition of the property by the United States was inoperative therein. As a consequence, it follows that defendant Blair was not due to pay the tax, and that the trial court correctly so ruled.

Let the judgment stand affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.

